IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IGAL HARBUZANIYA,<br><br>      Plaintiff,<br><br>vs.<br><br><br>GENNADIY KATS &<br><br>FIT FOR BUCKS CORPORATION<br><br>      Defendants | Case No.: 23-9155<br><br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

**Nature of the Action**

1. This is an action for: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, (2) violation of Section 25110 of the California Corporations Code, (3) Civil Breaches of Contract, (4) fraudulent inducement, (5) negligent misrepresentation, (6) Quantum Meruit and (7) Unjust Enrichment.

**Identification of the Parties**

2. Plaintiff Igal Harbuzaniya is an individual, a dual citizen of Israel and Russia, residing in Moscow, Russia.

3. On information and belief, Defendant Gennadiy Kats is an individual residing in California and is the controlling shareholder and executive of FIT FOR BUCKS CORPORATION.

4. On information and belief, Defendant FIT FOR BUCKS CORPORATION is a privately held Delaware corporation with its principal place of business in California.

COMPLAINT AND DEMAND FOR JURY TRIAL - 1

FIT FOR BUCKS CORPORATION securities are not registered with the U.S. Securities and Exchange Commission ("SEC") and do not trade on any U.S. national securities exchange.

## **Jurisdiction and Venue**

5.  This Court has subject matter jurisdiction over the federal securities law claims pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa.

6.  This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the plaintiff is a citizen of Israel and Russia, the defendant FIT FOR BUCKS CORPORATION is a Delaware corporation with a declared principal place of business in California, and defendant John Doe is a citizen of California. The amount in controversy exceeds $75,000.

7.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy.

8.  Venue is proper in this District under 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) because FIT FOR BUCKS CORPORATION has done business in this District.

COMPLAINT AND DEMAND FOR JURY TRIAL - 2

9. The exercise of personal jurisdiction over Defendants is proper because they have sufficient minimum contacts with New York through conducting business in this District.

## FACTS

### A. Introduction

10. Fit For Bucks Corporation ("FitForBucks") operates a health and wellness promotion company which uses a mobile application to monitor user physical activity as part of a process of "earning" discount offers and credits for vitamins, supplements, and other health related products or services.  Kats exercises full control over FitForBucks as its founder, controlling shareholder, CEO, and Chairman of the Board of Directors.

11. Between early 2018 and 2019, Kats solicited from Plaintiff, Kats' second cousin, an investment in FitForBucks in the form of a SAFE loan totaling $500,000 for the later purchase of FitForBucks shares.  A draft of the originally proposed Simple Agreement for Future Equity ("SAFE") in FitForBucks is attached as See Appendix A.

12. Shortly before consummation of the solicited investment, Kats changed the structure of the transaction from a single SAFE loan for the entire amount of a five hundred thousand dollars ($500,000), into two transactions:

COMPLAINT AND DEMAND FOR JURY TRIAL - 3

a. A SAFE loan agreement in the amount of $250K (See executed document attach as Appendix B), and

b. A private share sale of $250K directly from Katz to Igal proceeds (See executed as document attach Appendix C).

13. Last minute restructuring of the investment transaction provided Kats with unjust enrichment of $250K, while leaving FitForBuck with less (-$250K) operating capital than the company claimed it required to achieve any significant commercial milestones.

14. To induce Plaintiff into these transactions, Kats made material misstatements and omissions to Plaintiff regarding FitForBucks' financial condition, operations, and future prospects:

a. Kats declared to Plaintiff that FitForBucks had sufficient capitalization and business growth to achieve financial breakeven or an exit event before the operating capital runs out;

b. Kats declared to Plaintiff FitForBucks a valuation, $10M, only supported by some undetermined California State entity without providing any written support.

15. Kats failed to perform the minimum qualification required for the sale or offer to sell of any security offered in California.

COMPLAINT AND DEMAND FOR JURY TRIAL - 4

16. Kats failed to register the SAFE agreement as required by California law for the sale or offer to sell of any security offered in California to non-California residents.

**B. Material Misstatements and Omissions to Induce SAFE Agreement**

17. In February 2019, Kats induced Plaintiff to loan $250,000 to FitForBucks pursuant to a SAFE Agreement with no listed interest or date of maturity.

18. The SAFE Agreement provided that in the event FitForBucks is sold or conducts an initial public offering prior to the maturity date, Plaintiff would receive repayment of the $250,000 loan amount or equity securities equal to that amount and factoring a discount.

19. To induce Plaintiff to enter into the SAFE Agreement, Kats falsely stated that FitForBucks was on the verge of substantial revenue growth and would likely be sold or go public within the next two to three years.

20. In truth, and unbeknownst to Plaintiff, FitForBucks was struggling financially and there was no reasonable prospect of the company being sold or going public before the SAFE Agreement's maturity date.

21. Kats' statements concerning FitForBucks' growth prospects and likelihood of a near-term liquidity event were false and misleading when made because he knew, or was

COMPLAINT AND DEMAND FOR JURY TRIAL - 5

reckless or negligent in not knowing, that FitForBucks was actually in poor financial shape with no prospects for such events.

**C. Material Misstatements and Omissions to Induce Stock Purchase**

22. In February 2019, Kats sold 325,000 of his personally owned FitForBucks common stock to Plaintiff for $250,000 pursuant to a Stock Purchase Agreement.

23. To induce Plaintiff to enter into the Stock Purchase Agreement, Kats falsely represented that FitForBucks was valued at $10 million by a California Stage governmental body, without indicating which one. In truth, FitForBucks was never officially valued and the actual of the company worth was far less than $10 million at that time of the sale.

24. Kats also failed to disclose to Plaintiff that FitForBucks was experiencing financial difficulties, including cash flow problems that jeopardized its ability to continue operating. Kats further failed to disclose that a substantial portion of the $250,000 investment would be used to pay Kats' personal expenses rather than to fund FitForBucks' operations and growth.

25. The statements and omissions concerning FitForBucks' valuation and financial condition were materially false and misleading because Kats knew, or was reckless or negligent in not knowing, that his statements misrepresented the company's actual value and financial status.

COMPLAINT AND DEMAND FOR JURY TRIAL - 6

**D. Scienter**

26.    Kats knew, or was reckless or negligent in not knowing, that his statements to Plaintiff concerning FitForBucks' valuation, financial condition, and future prospects were materially false and misleading at the time they were made.

27.    Kats had unique insider knowledge of FitForBucks' true financial and operational status by virtue of his controlling position within the company.

28.    Kats was highly motivated to mislead Plaintiff regarding the true state of affairs at FitForBucks in order induce Plaintiff's investments so that Kats could misappropriate portions of the invested funds.

**E. Plaintiff's Reliance and Damages**

29.    Plaintiff reasonably relied on Kats' misstatements and omissions concerning FitForBucks' valuation, financials, and growth prospects when deciding to enter into the Stock Purchase Agreement and SAFE Agreement.

30.    As a direct result of Kats' fraud, Plaintiff invested a total of $500,000 and has not received any return on those investments. The FitForBucks shares purchased by Plaintiff are worthless and the SAFE Agreement loan amount has not been repaid.

31.    Plaintiff has suffered damages in an amount to be proven at trial but not less than $500,000 consisting of the total amount invested.

COMPLAINT AND DEMAND FOR JURY TRIAL - 7

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against Defendants Kats and FitForBucks)**

32.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

33.    Defendants Kats and FitForBucks carried out a plan, scheme, and course of conduct that was intended to, and did (i) deceive Plaintiff, as alleged herein; and (ii) cause Plaintiff to purchase FitForBucks securities at artificially inflated prices.

34.    Defendants Kats and FitForBucks (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon purchasers of FitForBucks' securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

35.    Plaintiff reasonably relied upon Defendants' misrepresentations and omissions and suffered damages as a direct and proximate result thereof.

**SECOND CAUSE OF ACTION:  Violations of California State Securities Laws – Unregistered Sale of Securities (Against Defendants Kats and FitForBucks)**

36. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

37. The securities sold by Defendants Kats and FitForBucks were not registered as required under applicable state securities laws.

38. By engaging in the unregistered offer and sale of securities as described above, Defendants Kats and FitForBucks violated California securities laws when offering and selling securities without proper registration or qualifying.

39. As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff has suffered damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION: Breach of Contract – SAFE Agreement (Against Defendant FitForBucks)**

40. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41. Plaintiff and Defendant FitForBucks entered into a Simple Agreement for Future Equity ("SAFE Agreement") under which Plaintiff provided a $250,000 loan to Defendant FitForBucks.

COMPLAINT AND DEMAND FOR JURY TRIAL - 9

42. The SAFE Agreement, dated February 2019, requires conversion of the $250,000 loan in equity upon a liquidity event or repayment upon dissolution of the company.

43. Defendants FitForBucks has breached the SAFE Agreement by failing to notify Plaintiff of liquidity and or dissolution events which occurred and triggered a repayment requirement of the $250,000 SAFE amount.

44. As a direct and proximate result of Defendant FitForBucks' breach of contract, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $250,000 plus accrued interest at the rate set forth in the SAFE Agreement.

**FOURTH CAUSE OF ACTION: Fraud in the Inducement (Against Defendant Kats)**

45. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46. Defendant Kats, with intent to deceive and defraud Plaintiff, made false statements of material fact or omitted material facts to Plaintiff concerning FitForBucks' valuation, financial condition, and future prospects, as detailed herein.

47. Defendant Kats knew that these representations were false and intended for Plaintiff to rely upon them.

COMPLAINT AND DEMAND FOR JURY TRIAL - 10

48.     Plaintiff reasonably relied on Defendant Kats' misrepresentations and omissions when deciding to enter into the Stock Purchase Agreement and SAFE Agreement referenced herein.

49.     As a direct and proximate result of Defendant Kats' fraudulent inducement, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $500,000.

**FIFTH CAUSE OF ACTION:  Negligent Misrepresentation (Against Defendant Kats)**

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     Defendant Kats owed a duty to Plaintiff to provide complete, accurate, and truthful information related to the offer and sale of FitForBucks' securities.

52.     Defendant Kats negligently breached this duty by providing false, incomplete, and misleading information to Plaintiff concerning FitForBucks' valuation, financial condition, and future prospects, as detailed herein.

53.     Plaintiff reasonably relied to his detriment on Defendant Kats' negligent misrepresentations and omissions concerning FitForBucks.

COMPLAINT AND DEMAND FOR JURY TRIAL - 11

54. As a direct and proximate result of Defendant Kats' negligent misrepresentations and omissions, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $500,000.

**SIXTH CAUSE OF ACTION: Unjust Enrichment (Against Defendant Kats)**

55. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56. Plaintiff conferred a benefit on Defendant Kats by investing $500,000 for the purchase of FitForBucks stock and the SAFE Agreement loan based on Defendant Kats' misrepresentations.

57. Defendant Kats appreciated, accepted, and retained the benefit of Plaintiff's $500,000 investment without providing any value in return.

58. Defendant Kats' retention of Plaintiff's $500,000 investment and any profits derived therefrom without compensation to Plaintiff is unjust and inequitable under the circumstances.

59. Plaintiff is entitled to damages based on the value of the benefit unjustly retained by Defendant Kats in an amount to be proven at trial, but not less than $750,000.

COMPLAINT AND DEMAND FOR JURY TRIAL - 12

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

A. Awarding compensatory damages to Plaintiff for Defendants' violations of federal securities laws, breaches of contract, fraud, and unjust enrichment in an amount to be proven at trial but not less than $500,000;

B. Awarding punitive damages to Plaintiff;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

D. Awarding pre-judgment and post-judgment interest at the maximum legal rate; and

E. Granting such other equitable or legal remedies as the Court deems just and proper.

Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 14, 2023                    Respectfully Submitted,

/s/ Vladimir Sherman, Esq.
*Attorney for Plaintiff*

CHRYSLER BUILDING, 37TH FLOOR
405 LEXINGTON AVENUE
NEW YORK, NEW YORK 10174

COMPLAINT AND DEMAND FOR JURY TRIAL - 13

# EXHIBIT A

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.   THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**FIT FOR BUCKS CORPORATION**

**SAFE**
**(Simple Agreement for Future Equity)**

THIS CERTIFIES THAT in exchange for the payment by GEORGIY HARBUZANIYA, (the "**Investor**") of $500,000 (the "**Purchase Amount**") on or about December 21, 2018, FIT FOR BUCKS CORPORATION, a United States corporation formed in the State of Delaware with file number 6069544, (the "**Company**") hereby issues to the Investor the right to certain shares of the Company's capital stock, subject to the terms set forth below.

The "**Valuation Cap**" is $10,000,000.

The "**Discount Rate**" is 85% (*100% minus the 15%*).

See **Section 2** for certain additional defined terms.

**1.  *Events***

(a) **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price.

In connection with the issuance of Safe Preferred Stock by the Company to the Investor pursuant to this Section 1(a):

(i) The Investor will execute and deliver to the Company all transaction documents related to the Equity Financing; *provided,* that such documents are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and *provided further,* that such documents have customary exceptions to any drag-along applicable to the Investor, including, without limitation, limited representations and warranties and limited liability and indemnification obligations on the part of the Investor; and

(ii)  The Investor and the Company will execute a Pro Rata Rights Agreement, unless the Investor is already included in such rights in the transaction documents related to the Equity Financing.

(b) **Liquidity Event**.  If there is a Liquidity Event before the expiration or termination of this instrument, the Investor will, at its option, either (i) receive a cash payment equal to the Purchase Amount (subject to the following paragraph) or (ii) automatically receive from the Company a number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price, if the Investor fails to select the cash option.

In connection with Section (b)(i), the Purchase Amount will be due and payable by the Company to the Investor immediately prior to, or concurrent with, the consummation of the Liquidity Event. If there are not enough funds to pay the Investor and holders of other Safes (collectively, the "**Cash-Out Investors**") in full, then all of the Company's available funds will be distributed with equal priority and *pro rata* among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the

remaining unpaid Purchase Amount divided by the Liquidity Price.  In connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce, *pro rata*, the Purchase Amounts payable to the Cash-Out Investors by the amount determined by its board of directors in good faith to be advisable for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, and in such case, the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price.

(c) **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount, due and payable to the Investor immediately prior to, or concurrent with, the consummation of the Dissolution Event. The Purchase Amount will be paid prior and in preference to any Distribution of any of the assets of the Company to holders of outstanding Capital Stock by reason of their ownership thereof. If immediately prior to the consummation of the Dissolution Event, the assets of the Company legally available for distribution to the Investor and all holders of all other Safes (the "**Dissolving Investors**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Investors of their respective Purchase Amounts, then the entire assets of the Company legally available for distribution will be distributed with equal priority and *pro rata* among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(c).

(d) **Termination**.  This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the issuance of stock to the Investor pursuant to Section 1(a) or Section 1(b)(ii); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b)(i) or Section 1(c).

2.  *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" means the **sum**, as of immediately prior to the Equity Financing, of: (**1**) all shares of Capital Stock (on an as-converted basis) issued and outstanding, assuming exercise or conversion of all outstanding vested and unvested options, warrants and other convertible securities, but excluding (A) this instrument, (B) all other Safes, and (C) convertible promissory notes; **and** (**2**) all shares of Common Stock reserved and available for future grant under any equity incentive or similar plan of the Company, and/or any equity incentive or similar plan to be created or increased in connection with the Equity Financing.

"**Conversion Price**" means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

-2-

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"**Distribution**" means the transfer to holders of Capital Stock by reason of their ownership thereof of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of Capital Stock by the Company or its subsidiaries for cash or property other than: (i) repurchases of Common Stock held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to an agreement providing, as applicable, a right of first refusal or a right to repurchase shares upon termination of such service provider's employment or services; or (ii) repurchases of Capital Stock in connection with the settlement of disputes with any stockholder.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed pre-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" means the number, as of immediately prior to the Liquidity Event, of shares of Capital Stock (on an as-converted basis) outstanding, assuming exercise or conversion of all outstanding vested and unvested options, warrants and other convertible securities, but **excluding**: (i) shares of Common Stock reserved and available for future grant under any equity incentive or similar plan; (ii) this instrument; (iii) other Safes; and (iv) convertible promissory notes.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Valuation Cap divided by the Liquidity Capitalization.

"**Pro Rata Rights Agreement**" means a written agreement between the Company and the Investor (and holders of other Safes, as appropriate) giving the Investor a right to purchase its *pro rata* share of private placements of securities by the Company **occurring after the Equity Financing**, subject to customary exceptions. *Pro rata* for purposes of the Pro Rata Rights Agreement will be calculated based on the ratio of (1) the number of shares of Capital Stock owned by the Investor immediately prior to the issuance of the securities to (2) the total number of shares of outstanding Capital Stock on a fully diluted basis, calculated as of immediately prior to the issuance of the securities.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.

"**Safe Preferred Stock**" means the shares of a series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Valuation Cap divided by the Company Capitalization.

-3-

"**Standard Preferred Stock**" means the shares of a series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

3. *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Investor has been advised that this instrument and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this instrument and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the

merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5. *Miscellaneous*

(a)  Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the Investor.

(b)  Any notice required or permitted by this instrument will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of Capital Stock for any purpose, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein.

(d)  Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this instrument in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

(*Signature page follows*)

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

**FIT FOR BUCKS CORPORATION**

By:_____

    *GENNADIY KATS*
    President

Address: 4169 Via Marina, #206_____

      Marina Del Rey, CA 90292_____

Email: gennadiy@fitforbcuks.com

**INVESTOR:**

By:

Name:

Title:

Address:

# EXHIBIT B

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.    THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**FIT FOR BUCKS CORPORATION**

**SAFE**
**(Simple Agreement for Future Equity)**

THIS CERTIFIES THAT in exchange for the payment by IGAL HARBUZANIYA, (the "**Investor**") of **$250,000** (the "**Purchase Amount**") on or about February 11, 2019, FIT FOR BUCKS CORPORATION, a United States corporation formed in the State of Delaware with file number 6069544, (the "**Company**") hereby issues to the Investor the right to certain shares of the Company's capital stock, subject to the terms set forth below.

The "**Valuation Cap**" is $10,000,000.

The "**Discount Rate**" is 85% (*100% minus the 15%*).

See **Section 2** for certain additional defined terms.

1. *Events*

(a) **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price.

In connection with the issuance of Safe Preferred Stock by the Company to the Investor pursuant to this Section 1(a):

(i) The Investor will execute and deliver to the Company all transaction documents related to the Equity Financing; *provided,* that such documents are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and *provided further,* that such documents have customary exceptions to any drag-along applicable to the Investor, including, without limitation, limited representations and warranties and limited liability and indemnification obligations on the part of the Investor; and

(ii) The Investor and the Company will execute a Pro Rata Rights Agreement, unless the Investor is already included in such rights in the transaction documents related to the Equity Financing.

(b) **Liquidity Event**.  If there is a Liquidity Event before the expiration or termination of this instrument, the Investor will, at its option, either (i) receive a cash payment equal to the Purchase Amount (subject to the following paragraph) or (ii) automatically receive from the Company a number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price, if the Investor fails to select the cash option.

In connection with Section (b)(i), the Purchase Amount will be due and payable by the Company to the Investor immediately prior to, or concurrent with, the consummation of the Liquidity Event. If there are not enough funds to pay the Investor and holders of other Safes (collectively, the "**Cash-Out Investors**") in full, then all of the Company's available funds will be distributed with equal priority and *pro rata* among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the

remaining unpaid Purchase Amount divided by the Liquidity Price. In connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce, *pro rata*, the Purchase Amounts payable to the Cash-Out Investors by the amount determined by its board of directors in good faith to be advisable for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, and in such case, the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price.

(c) **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount, due and payable to the Investor immediately prior to, or concurrent with, the consummation of the Dissolution Event. The Purchase Amount will be paid prior and in preference to any Distribution of any of the assets of the Company to holders of outstanding Capital Stock by reason of their ownership thereof. If immediately prior to the consummation of the Dissolution Event, the assets of the Company legally available for distribution to the Investor and all holders of all other Safes (the "**Dissolving Investors**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Investors of their respective Purchase Amounts, then the entire assets of the Company legally available for distribution will be distributed with equal priority and *pro rata* among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(c).

(d) **Termination**. This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the issuance of stock to the Investor pursuant to Section 1(a) or Section 1(b)(ii); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b)(i) or Section 1(c).

2. *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" means the **sum**, as of immediately prior to the Equity Financing, of: (**1**) all shares of Capital Stock (on an as-converted basis) issued and outstanding, assuming exercise or conversion of all outstanding vested and unvested options, warrants and other convertible securities, but excluding (A) this instrument, (B) all other Safes, and (C) convertible promissory notes; **and** (**2**) all shares of Common Stock reserved and available for future grant under any equity incentive or similar plan of the Company, and/or any equity incentive or similar plan to be created or increased in connection with the Equity Financing.

"**Conversion Price**" means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

-2-



"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"**Distribution**" means the transfer to holders of Capital Stock by reason of their ownership thereof of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of Capital Stock by the Company or its subsidiaries for cash or property other than: (i) repurchases of Common Stock held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to an agreement providing, as applicable, a right of first refusal or a right to repurchase shares upon termination of such service provider's employment or services; or (ii) repurchases of Capital Stock in connection with the settlement of disputes with any stockholder.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed pre-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" means the number, as of immediately prior to the Liquidity Event, of shares of Capital Stock (on an as-converted basis) outstanding, assuming exercise or conversion of all outstanding vested and unvested options, warrants and other convertible securities, but **excluding**: (i) shares of Common Stock reserved and available for future grant under any equity incentive or similar plan; (ii) this instrument; (iii) other Safes; and (iv) convertible promissory notes.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Valuation Cap divided by the Liquidity Capitalization.

"**Pro Rata Rights Agreement**" means a written agreement between the Company and the Investor (and holders of other Safes, as appropriate) giving the Investor a right to purchase its *pro rata* share of private placements of securities by the Company **occurring after the Equity Financing**, subject to customary exceptions. *Pro rata* for purposes of the Pro Rata Rights Agreement will be calculated based on the ratio of (1) the number of shares of Capital Stock owned by the Investor immediately prior to the issuance of the securities to (2) the total number of shares of outstanding Capital Stock on a fully diluted basis, calculated as of immediately prior to the issuance of the securities.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.

"**Safe Preferred Stock**" means the shares of a series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Valuation Cap divided by the Company Capitalization.

-3-

"**Standard Preferred Stock**" means the shares of a series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

3. *Company Representations*

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b) The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c) The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d) No consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e) To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a) The Investor has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Investor has been advised that this instrument and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this instrument and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the

-4-



merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5. **Miscellaneous**

(a) Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the Investor.

(b) Any notice required or permitted by this instrument will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c) The Investor is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of Capital Stock for any purpose, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein.

(d) Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this instrument in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e) In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f) All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

(*Signature page follows*)

-5-

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

**FIT FOR BUCKS CORPORATION**

By:_____
*GENNADIY KATS*
President

Address: 4169 Via Marina, #206

Marina Del Rey, CA 90292

Email: gennadiy@fitforbcuks.com

**INVESTOR:**

By:

Name: ILAL HABURZANIYA

Title:

Address: Moscow NEYSKEGO ALEX ANDER st 87/1

EXHIBIT C

# Stock Purchase Agreement

THIS AGREEMENT is made and entered on February 11, 2019 by and between, GENNADIY KATS ("Seller") of 4169 Via Marina, #206, Marina Del Rey, CA 90292, USA and IGAL HABURZANIYA ("Purchaser") of Aleksandra Nevskogo street, 27, #1, Moscow, Russia.

WITNESSETH:

Whereas, the Seller is a Stockholder in Fit For Bucks Corporation, who is the record owner of outstanding shares of the capital stock of Fit For Bucks Corporation (hereinafter referred to as the "Corporation"), a Delaware corporation, which has authority to sell **325,000** shares of capital stock at **$0.0001** par value common stock, and

WHEREAS, the Purchaser desires to purchase said stock and the Seller desires to sell said stock, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and Agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Corporation's Stock aforementioned, it is hereby agreed as follows:

**Purchase and Sale**
Subject to the terms and conditions hereinafter set forth, at the closing of the transaction contemplated hereby, the Seller shall sell, convey, transfer, and deliver to the Purchaser certificates representing such stock, and the Purchaser shall purchase from the Seller the Corporation's Stock in consideration of the purchase price set forth in this Agreement. The certificates representing the Corporation's Stock shall be duly endorsed for transfer or accompanied by appropriate stock transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary documentary transfer tax stamps affixed thereto at the expense of the Seller.

The closing of the transactions contemplated by this Agreement (the "Closing"), shall be held at _____, Moscow, Russia on _____, at _____, or such other place, date and time as the parties hereto may otherwise agree.

**Amount and Payment of Purchase Price**
**(a) Consideration**
As total consideration for the purchase and sale of the Corporation's Stock, pursuant to this Agreement, the Purchaser shall pay to the Seller the sum of **$250,000**, such total consideration to be referred to in this Agreement as the "Purchase Price".

**(b) Payment**
The Purchase Price shall be paid as follows:

The sum of **$250,000** to be delivered to Seller upon the execution of this Agreement at Closing.

1

**Representations and Warranties of Seller**
Seller hereby warrants and represents:

**(a) Organization and Standing**
The Seller is a stockholder and record owner of the issued and outstanding shares of the capital stock of the Corporation, which is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the Corporation has the corporate power and authority to carry on its business as it is now being conducted.

**(b) Restrictions on Stock**
i. The Seller is not a party to any Agreement, written or oral, creating rights in respect to the Corporation's Stock in any third person or relating to the voting of the Corporation's Stock.

ii. Seller is the lawful owner of the Stock, free and clear of all security interests, liens, encumbrances, equities and other charges.

iii. There are no existing warrants, options, stock purchase agreements, redemption agreements, restrictions of any nature, calls or rights to subscribe of any character relating to the stock, nor are there any securities convertible into such stock.

**Representations and Warranties of Seller and Purchaser**
Seller and Purchaser hereby represent and warrant that there has been no act or omission by Seller and Purchaser which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

**General Provisions**
**(a) Entire Agreement**
This Agreement (including any written amendments hereof executed by the parties) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

**(b) Sections and Other Headings**
The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**(c) Governing Law**
This Agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of Delaware. In the event that litigation results from or arises out of this Agreement or the performance thereof, the parties agree to reimburse the prevailing party's reasonable attorney's fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

2

SELLER:

_Gennadiy Kats_      _Feb 15, 2019_
Gennadiy Kats          Date

PURCHASER:

_IGAL HABURZANIYA_      _Feb 15, 2019_
Igal Haburzaniya          Date

3

# Certificate of Shares

FIT FOR BUCKS CORPORATION

Incorporated under the laws of the State of Delaware

Shareholder: **Igal Haburzaniya**

This Certificate hereby grants **325,000** shares of FIT FOR BUCKS CORPORATION **Common Stock** to IGAL HABURZANIYA, on this day, _11 February, 2019_

Amount of Consideration: $250,000

Issued and Authorized by the following officers of the Corporation:

Gennadiy Kats          President/Secretary          _Gennadiy Kats_

*This is to certify that the above named shareholder has fully paid for the non-assessable shares of the above Corporation transferable only on the books of the Corporation by the holder thereof in person or by a duly authorized Attorney upon surrender of this Certificate properly endorsed.*

Case 2:26-cv-08952-SRM-AYP    Document 1    Filed 12/28/23    Page 32 of 33    Page ID #:32

*For Value Received,* Gennady Kets *hereby sells, assigns and transfers unto* Igal Haburzania 325,000 *Shares represented by the within Certificate, and does hereby irrevocably constitute and appoint* ~~35~~ Gennady Kets *Attorney to transfer the said shares on the books of the within named Corporation with full power of substitution in the premises.*

*Dated* 11 February 20 19

Gennady Kets

(SIGNATURE)

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN LIMITATIONS ON TRANSFER AND MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE TRANSFERRED OR OTHERWISE DISPOSED OF PRIOR TO ONE YEAR FROM THE DATE OF THE CLOSING AT WHICH SUCH SHARES WERE PURCHASED WITHIN THE UNITED STATES, CANADA, THEIR TERRITORIES AND POSSESSIONS OR ANY AREA SUBJECT TO THEIR JURISDICTION, OR TO ANY CITIZEN OR RESIDENT OF THE UNITED STATES OR CANADA, OR ANY STATE, TERRITORY OR POSSESSION THEREOF, INCLUDING ANY ESTATE OF SUCH PERSON OR ANY CORPORATION, PARTNERSHIP, TRUST OR OTHER ENTITY CREATED OR EXISTING UNDER THE LAWS THEREOF, AND THEREAFTER MAY NOT BE SO TRANSFERRED ABSENT AN EFFECTIVE REGISTRATION THEREOF UNDER SUCH ACT OR IN COMPLIANCE WITH RULE 144 PROMULGATED UNDER SUCH ACT, OR UNLESS THE ISSUER HAS RECEIVED AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED.